IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-90558 |
| **PARADOX RESOURCES, LLC,** *et al.,* | § | |
| | § | **Chapter 11** |
| Debtors.[1] | § | |
| | § | **(Jointly Administered)** |

**LEGALIST, INC.'S MOTION
FOR ENTRY OF AN ORDER (I) ALLOWING AND DIRECTING
PAYMENT OF ITS ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO
11 U.S.C. §§ 503(b)(1)(A) AND 503(b)(3)(D) AND (II) GRANTING RELATED RELIEF**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Legalist Inc. ("Legalist"), by and through its undersigned counsel, hereby files its Motion for Entry of an Order (I) Allowing and Directing Payment of Its Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(b)(1)(A) and 503(b)(3)(D) and (II) Granting Related Relief (the "Motion") granting Legalist an allowed administrative expense claim in the amount of $250,000 under sections 503(b)(1)(a) and 503(b)(3)(D) of title 11 of the United States Code (the "Bankruptcy Code") and requiring immediate payment of the same, and in support hereof, respectfully states as follows:

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Paradox Resources, LLC (7152); Paradox Midstream, LLC (2127); Paradox Upstream, LLC (0256); Capital Commercial Development, Inc. (3124); Neuhaus Barrett Investments, LLC (5529); Four Corners Energy, LLC (8159); and Four Corners Pipeline, LLC (8748).  The Debtors' service address is: 500 Dallas Street, Suite 1600, Houston, Texas 77002.

## I.      **INTRODUCTION**

1.      Legalist's participation in these chapter 11 cases by agreeing to make a substantial Debtor in Possession ("DIP") loan for the entirety of the amount needed per the Debtors' budget resulted in the incumbent lender, after refusing to even fund cash collateral on anything other than an emergency basis, finally agreeing to make its own DIP loan at a significantly lower cost than what Legalist and the Debtor had agreed upon.  When Legalist committed to making its DIP loan of $13,803,750.00, the Debtors were quickly approaching the conclusion of their liquidity runway and a chapter 11 filing: cash was deteriorating; the prepetition lender, Washington Federal ("WaFd"), had snubbed the Debtors' repeated requests to enter a new DIP financing arrangement; and both customers and vendors were preparing to extricate their businesses from the Debtors'.  Unsolicited, the Debtors, in dire need of funding, reached out to Legalist. Legalist, who was previously unaware of the Debtors' existence and their circumstances, answered the call and quickly negotiated to provide financing on mutually acceptable terms as reflected in the *Summary of Key Terms of and Conditions for Debtor-in-Possession Term Loan Facility* attached hereto as Exhibit A (the "Legalist DIP Term Sheet").

2.      Included in the Legalist DIP Term Sheet is a customary Break-Up Fee (the "Break-Up Fee"), designed to protect Legalist in the event the Debtors pivoted away from Legalist and elected not to effectuate the DIP reflected in the Legalist DIP Term Sheet (the "Legalist DIP Facility").  Now that the Debtors have pivoted to an alternative DIP facility and realized the benefit of the work put in by Legalist and its advisors, they refuse to honor the terms of the Legalist DIP Term Sheet.  Given the postpetition benefit to the estate created by work that was completed pursuant to the Legalist DIP Term Sheet, Legalist is entitled to an administrative claim in at least the amount of the Break-Up Fee.  The Legalist DIP Term Sheet expressly provides for the payment of the Break-Up Fee as an administrative expense in a chapter 11 case.  Having availed itself of

the benefits of entering the Legalist DIP Term Sheet, the Debtors cannot avoid its obligations to pay the costs of having Legalist participate in the negotiations.  Note that to the date of this filing, the Legalist DIP Term Sheet has not been terminated pursuant to its terms, nor has it been rejected pursuant to section 365 of the Bankruptcy Code.

## II.     <u>RELIEF REQUESTED</u>

3.     By this Motion, Legalist seeks entry of an order: (i) allowing Legalist an administrative expense claim for the Break-Up Fee in the amount of $250,000; (ii) directing the Debtors to promptly pay such administrative claim; and (iii) any further relief the Court deems appropriate under the circumstances.

## III.     <u>JURISDICTION AND VENUE</u>

4.     This Court has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

5.     The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 365, 503(b)(1), 503(b)(3), and 507(a)(2) of the Bankruptcy Code, and Rules 2002, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## IV.     <u>BACKGROUND</u>

### A.     <u>The Debtors' Circumstances.</u>

6.     On May 22, 2023, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Court</u>"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered by the Court under Case No. 23-90558 (the "<u>Chapter 11 Case</u>").

7.      At the first-day hearing held on May 24, 2023, the Debtors advised the Court and WaFd that they would struggle to make the upcoming payroll, and the Debtors' cash shortfall was readily apparent in the exhibits and evidence presented. On two occasions during the first month of their Chapter 11 cases, the Debtors were forced to file emergency motions authorizing protective advance loans from WaFd [Docket Nos. 44, 76].  On May 26, 2023, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving Protective Advance Loan from Washington Federal Bank, N.A. and (II) Granting Related Relief* [Docket No. 44].  Therein, the Debtors noted:

> The Debtors do not currently have sufficient cash from operations to meet their obligations as they come due and address basic operational issues necessary to preserve the value of their businesses, such as paying employees. Preserving estate value and maintaining employee relationships is vital at this initial stage of the Chapter 11 Case.

WaFd agreed to provide a $250,000 protective advance. That sum comprised $200,000 to fund payroll and a $50,000 liquidity cushion, an insufficient cushion for a business the size of the Debtors'.

8.      On June 14, 2023, the Debtors filed a second emergency motion for a protective advance [Docket No. 72], noting that they could not fund the previously approved adequate assurance deposits for utility providers. Therein, the Debtors stated they have "additional cash needs beyond what will be available in the form of a protective advance from WaFd." In sum, the Debtors were in dire need of cash and scrambling to identify a source to provide it. WaFd was unwilling to provide the necessary funds to enable a smooth restructuring or sale process.

**B.      The Legalist DIP Term Sheet and Negotiating Definitive Documents.**

9.      On or around May 3, 2023, anticipating a chapter 11 filing where WaFd would not provide the financial support necessary, Legalist and the Debtors executed the Legalist DIP Term Sheet. During the subsequent two-and-a-half month period (approximately 19 days prepetition and

35 days postpetition), Legalist expended substantial resources, both in the form of time and money,[2] (i) negotiating and documenting the terms and conditions of the *Senior Secured Debtor-in-Possession Credit Agreement* (the "Legalist DIP Credit Agreement") and the Legalist DIP Order,[3] and (ii) effectuating the actions necessary, both internally, through due diligence and investment committee review, and externally, through capital calls and investor discussions, to secure the DIP funds.

10.     During the two-week period leading up to the June 26 hearing to approve the Legalist DIP Facility, the Debtors, Legalist, and their advisors worked non-stop to finalize the definitive documents.  On Thursday, June 22, 2023, the Debtors filed an agreed-upon form of motion and order to approve the Legalist DIP Credit Agreement [Docket No. 92]. Then, on Friday, June 23, 2023, around 8:01 p.m. Central Time, Mr. Joshua Caldwell, Senior Manager at Stout and financial advisor to the Debtors, sent an updated budget to Legalist. Mr. Caldwell's email noted three revisions to the budget: "(1) adjustment to Pontem's monthly fees from $50,000 per month to $60,000 per month, (2) updated receipts over the 14-week period, and (3) updated producer COGs over the 14-week period."  No additional details were noted.  While accurate on its face, the brief explanation masked the significance of the revisions. There were, in fact, several significant changes wrapped into the COGs revision. First, on the revenue side, the Debtors' production of propane, NGLs, and helium yield progressively fell after filing for chapter 11 versus prepetition projections.  Further, the non-operated producers continued to shut in production given the chapter 11 process, and although negotiations with the Debtors were in the process to bring

---

[2] NTD: Legalist, Please let us know your total fees expended

[3] On June 26, 2023, the Debtors filed the agreed-upon form of the *Interim Order (I) Authorizing Use of Cash Collateral; (II) Authorizing the Debtors to Obtain Secured Post-Petition Financing; (III) Granting Liens and Superpriority Claims; (IV) Granting Adequate Protection ; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Legalist DIP Order") [Docket No. 119].

some back on, they were not proceeding as rapidly as expected.  The Debtors overestimated their ability to get non-operated producers back on.  Their control of their own produced sales of propane/natural gasoline was low and their helium yield was lower than expected.  Furthermore, the 3rd party volumes spreadsheet was misleading, and Legalist's consultants were unable to make sense until the day of the hearing.  In fact, Legalist's consultants were required to have a telephone conference with the vice president of operations of the Debtors, who, on the day of the hearing expressed that the yields were confusing. Finally, on the cost side, equipment rental operating costs increased.

11.     Notwithstanding the last-minute budget updates, Legalist worked through the weekend to prepare for the June 26 hearing. But, by the time B. Riley Financial ("B. Riley"), Legalist's financial advisor, was able to line up a meeting with Stout and the Debtors to discuss the revised budget; the hearing time had come and gone. The budget revision required Legalist to update its investment committee. Despite substantial efforts, Legalist was not ready to move forward with the hearing on June 26.  In an effort to resolve all budget issues, following the June 26 hearing, Legalist participated in a multi-hour phone call with Pontem, Stout, B. Riley, and other advisors to Legalist and the Debtors to get comfortable with the revised budget. As of that night, Legalist was committed to lend.

12.     Legalist had also resolved nearly all informal objections to the various loan documents with the unsecured creditor's committee and other parties in interest. Because Legalist believed it would reach an understanding that evening related to the budget, the parties agreed to continue the hearing to the next day, June 27, 2023, at noon CST. Late that evening, Mr. Matthew Okin, Debtors' counsel, requested that the hearing be moved to 5 p.m. CST "[a]fter speaking to my client and witnesses." *See* Okin Email attached hereto as Exhibit C.  It now appears that

4861-2612-1327

Debtors' counsel needed the additional time to negotiate a DIP financing agreement with WaFd. Legalist was prepared to proceed at noon, but the Debtors were not.

13.     Unbeknownst to Legalist, and not for lack of inquiry, Debtor's counsel used Legalist as a pseudo-stalking-horse lender to pursue a DIP loan from WaFd. As described in further detail below, it was not until Legalist was at the courthouse prepared to lend that the Debtors' counsel notified Legalist that WaFd offered an acceptable DIP loan to which the Debtors planned on pivoting. In fact, as recently as June 24, 2023, at 7:12 p.m. CST, Debtors' counsel represented to Legalist that there was no actionable proposal from WaFd; in fact, *no* ask had even been made by WaFd related to a DIP credit facility.  Debtors' counsel generally denied any ongoing discussions with WaFd during the negotiations with Legalist. On June 26, Legalist first became aware of a potential DIP proposal from WaFd when their counsel mentioned that he was working on a proposal. On June 27, the date the Debtors announced at the podium that they were no longer accepting Legalist's proposal, the Debtors' counsel essentially ignored Legalist and their counsel entirely.  In fact, the agreement with WaFd was not made until literally a minute before the hearing. This is all to say, until the hearing at 5:00 p.m. CST on June 27, Legalist and its advisors were reasonably acting as if they were going to be the DIP lenders.

## C.     **Triggering the Break-Up Fee.**

14.     Being the prepetition secured lender, WaFd offered a "defensive" DIP protecting their lien position *via* low-cost funding while bypassing a priming fight.  Certainly, WaFd's agreement to lend provided *substantial* benefit to the estate. Legalist does not contend that the Debtors improperly elected to enter a DIP credit facility with WaFd; only that the Debtors must comply with the Legalist DIP Term Sheet and pay the Break-Up Fee. Now, the Debtors refuse to

honor the terms of its executed term sheet with Legalist. Specifically, the Legalist DIP Term Sheet states:

> "If, after the execution hereof and after the DIP Lender provides written notice that it has completed its due diligence and is prepared to commit to lend, the transaction described herein should not be timely effected for any reason other than the breach by DIP Lender or the DIP Lender's decision not to proceed, the DIP Lender shall (and without any further action or notice) be entitled to a fee of $250,000."

On June 20, 2023, at 4:09 p.m. CST, Legalist sent an email to Debtors' counsel stating, "we have committee approval to proceed with the DIP," satisfying the precondition of the Break-Up Fee. Further, on June 27, 2023, at 4:56 p.m. CST, in advance of the 5:00 p.m. CST hearing where Debtors' counsel announced that it had elected to go with an alternative proposal, Legalist, through counsel provided written notice via email that Legalist had completed its due diligence and is committed to lending.  Finally, later that evening, on June 27, 2023, Legalist provided a letter, attached hereto as <u>Exhibit B</u>, stating, "Legalist is fully committed to fund $13,803,750 at the terms and conditions as fully negotiated in the credit agreement. Legalist has completed its due diligence and is committed to lend." Again, to date, the Legalist DIP Term Sheet remains outstanding. No action has been taken to reject or terminate the agreement, but it is the contention of Legalist that the "transactions described" in the Legalist DIP Term Sheet were not timely effected.

15.     Further, a footnote to the Break-Up Fee provision in the Legalist DIP Term Sheet states:

> "The Debtor acknowledges that the Break-Up Fee is intended to be an actual, necessary cost and expense of preserving its estate and, thus, entitled to priority under Bankruptcy Code section 503(b)."

At the time of execution of the Legalist DIP Term Sheet, the Debtors recognized the value the Legalist DIP Term Sheet offered estate regardless of whether the facility was effectuated. The Debtors acknowledged that the costs of entering the Legalist DIP Term Sheet (including the

8

Break-Up Fee) were necessary for the preservation of the value of the estate.  Legalist expended their resources in good faith, was induced by the Debtors to do so, and their work provided a clear benefit to the Debtors' estates.  As further explained below, the Debtors' refusal to pay the Break-Up Fee violates the DIP Term Sheet, and therefore Legalist should be entitled to an administrative claim in the amount of the Break-Up Fee.

16.     Finally, the Debtors' Chief Restructuring Officer, Douglas Brickley, testified forthrightly on direct examination that the Term Sheet with Legalist included a $250,000 Break Up Fee.

### V.     BASIS FOR RELIEF REQUESTED

### D.     Legalist's Post-Petition Actions Benefitted the Debtors' Estates.

17.     Section 503 of the Bankruptcy Code provides that parties may file requests for payment of administrative expenses for "actual, necessary costs and expenses of preserving the estate." *See* section 503(b)(1)(A) of the Bankruptcy Code. Courts have construed the words "actual" and "necessary" to mean that the expenses must have benefitted the debtors' estates and their creditors. *NL Indus., Inc. v. GHR Energy Corp. (In re GHR Energy Corp.)*, 940 F.2d 957, 966 (5th Cir. 1991).[4] The primary purpose of the priority treatment afforded by section 503(b) of the Bankruptcy Code is to encourage third parties to continue to contract with the debtor in possession so that it can continue to conduct its business, thus generating funds from which prepetition creditors can be paid. *Id.* As such, a prima facie case under section 503(b)(1) of the Bankruptcy Code may be established by evidence that (a) the claim arises from a transaction with the debtor and (b) the subject of the claim (*i.e.*, the goods or services supplied by the claimant)

---

[4] *But see In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 437 (5th Cir. 1998) ("The 'benefit' requirement has no independent basis in the Code, however, but is merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no 'benefit,' it cannot have been 'necessary.'").

enhanced the ability of the debtor's business to function as a going concern. *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1420 (5th Cir. 1992). Here, the Break-Up Fee certainly arises from a transaction with the Debtors, and the claimant certainly enhanced the ability of the Debtors to operate as a going concern.  "Although the estate receives a benefit that often can be measured by the actual cost of necessary goods or services supplied, the estate also receives other less readily calculable benefits, such as the ability to continue to conduct business as usual." *Id.* (citing *In re Coastal Carriers Corp.*, 128 B.R. 400, 402 (Bankr. D. Md. 1991)).[5] Availability of cash, goods, or services can be important to a debtor's ongoing business. As such, "when a debtor-in-possession induces availability [of cash, goods, or services] and the bankruptcy estate derives a benefit from it, the ordinary cost of ensuring such availability qualifies as an administrative expense, even if the goods or services were ultimately not used." *In re Whistler Energy II, L.L.C.*, 931 F.3d 432 (5th Cir. 2019). Further, the focus in the Fifth Circuit is on when the benefit was conferred on the Debtor, not on the formality of the agreement.  *See Matter of Bouchard Transportation Co., Inc.*, No. 22-20321, 2023 WL 4735517, at 10-11 (5th Cir. July 25, 2023).

18.     Administrative expense priority is particularly appropriate where a debtor "enjoys the benefits of the contract pending assumption or rejection." *In re Smurfit-Stone Container Corp.*, 425 B.R. 735, 741 (Bankr. D. Del. 2010). Here, the Break-Up Fee is a prima facie case under section 503(b)(1) of the Bankruptcy Code as (a) the claim arises from, and was triggered by, postpetition interactions with the Debtors, and (b) the ongoing negotiations enhanced the ability of the Debtors to function as a going concern. The anticipated availability of a DIP credit facility

---

[5] The benefit to a debtor's estate may even take the form of achieving a beneficial result from a negotiation within the context of a debtor's bankruptcy case. *See Metro. Life Ins. Co. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 161 B.R. 934, 937-38 (Bankr. W.D. Pa. 1994) (finding that postpetition insurance premiums were entitled to administrative expense priority because the debtor's continued insurance coverage of its employees "assisted the Debtor in negotiations with the USWA [(the employees' labor union)] and in development of a plan of reorganization—a direct benefit to the bankruptcy estate.").

subject to the terms and conditions of the Legalist DIP Term Sheet was mission-critical to maintaining the Debtors' business. In addition to the benefits of WaFd's DIP facility to the estate, the mere existence of the Legalist DIP Term Sheet enabled the Debtors to represent other parties in interest that there was a plan in place to extend their liquidity runway.  The Break-Up Fee was put in place because both the Debtors and Legalist were aware of the value that would be provided by the Legalist DIP Term Sheet regardless of whether the Legalist DIP Credit Agreement was effectuated. As previously noted, even the Debtors acknowledged that the Break-Up Fee was an "actual" and "necessary" cost and expense of the estate.  That value was realized upon the approval of the WaFd DIP Credit Agreement.

**E.**     **Legalist Requests a "Substantial Contribution" Claim of $250,000 for Reasonable and Necessary Fees and Expenses Incurred in Connection with This Case.**

19.     Alternatively, Legalist should be entitled to an administrative claim for the Break-Up Fee incurred whilst making a substantial contribution to these chapter 11 cases pursuant to section 503(b)(3)(D) of the Bankruptcy Code. The entity attempting to prove that it has made a substantial contribution under the administrative expenses section of the Bankruptcy Code, must do so by a preponderance of the evidence. *In re Energy Partners, Ltd.*, 422 B.R. 68 (Bankr. S.D. Tex. 2009). Services that provide a substantial contribution to an estate are those that "foster and enhance, rather than retard or interrupt the progress of reorganization." *In re R.L. Adkins Corp.*, 505 B.R. 770, 780 (Bankr. N.D. Tex. 2014) (citation omitted). All the relevant factors favor payment of the claim in this case by at least a preponderance of the evidence, as outlined below:

- **Whether the services involved in the contribution provided a benefit to the estate**. Legalist's role as proposed DIP lender (a) provided the Debtors with a safety net in the event they were unable to secure a DIP credit facility from their preexisting debtor and (b) motivated WaFd to provide postpetition financing. Absent Legalist's participation, the Debtors most likely would not have received a DIP loan of sufficient size and would have had to liquidate under chapter 7 of the Bankruptcy Code.

- **Whether the applicant would have undertaken the same approach absent the expectation of compensation from the bankruptcy estate.** Legalist worked postpetition because they believed that, at the very least, they would be entitled to the Break-Up Fee. Although this amount was insufficient to cover its legal and financial advisor fees, it at least provided some comfort that they would be able to recover certain amounts. If Legalist believed that they would have been on the hook for 100% of the professional fees, they most likely would not have engaged in such time-consuming and expensive negotiations.

- **Whether the benefit conferred through the applicant's contribution exceeds the cost which the applicant seeks to assess against the estate.** The Break-Up Fee is relatively small for a case this size. In fact, the Break-Up Fee is a small percentage of the savings realized by the Debtors in effectuating the WaFd DIP facility.

- **Whether the efforts of the applicant were duplicative of efforts undertaken by statutory fiduciaries.** The efforts were not duplicative because no other party was willing to provide a DIP loan facility. In fact, Stout reached out to 33 parties to provide one, and Legalist was the only actionable offer.

- **Whether the applicant profited from the situation or rather faced substantial loss if it had not undertaken the approach that it did.** Legalist faces a substantial loss regardless of whether the Break-Up Fee is approved. It has foregone other opportunities and faces the reality that it may not be paid for months of work.

- **Whether the applicant had a negative effect on the case, such as making questionable objections to pleadings filed by the debtor or engaging in improper conduct in some other fashion that caused the debtor to incur costs, or which delayed the resolution of the case.** Legalist has only helped the Debtors' estates; it has never been burdensome or otherwise negatively impacted the case.

*See In re Energy Partners, Ltd.*, 422 B.R. 68, 80 (Bankr. S.D. Tex. 2009) (citation omitted).

Pursuant to the Legalist DIP Term Sheet, the expenses of Legalist include the Break-Up Fee. By providing services to preserve (and enhance) the Debtors' estates, Legalist forewent opportunities to work on other deals. Accordingly, administrative priority should be given to the Break-Up Fee, pursuant to section 503(b)(3)(D) of the Bankruptcy Code.

## F.    Legalist's Postpetition Actions Benefitted the Debtors' Estates and Were Taken As Part of a Non-Rejected Executory Contract.

20.    Even if the Legalist is not entitled to an administrative claim on account of its substantial contribution, Legalist also was acting pursuant to an executory contract on a

postpetition basis. The Debtors treated the Legalist DIP Term Sheet as an ongoing agreement and therefore are obligated to pay the Break-Up Fee, which arose post-petition, pre-rejection, as an administrative priority. The Debtors have had, and continue to have, ample opportunity to reject the Legalist DIP Term Sheet.  They have not done so. Although the lending commitment itself is not executory pursuant to section 365(c)(2) of the Bankruptcy Code, the commitment of Legalist to stand by and maintain availability and the Debtors' obligation to pay the Break-Up Fee remains executory. The services giving rise to the executory contracts were performed, and Debtors continued to treat the Legalist DIP Term Sheet as an active and ongoing contract. Legalist expended substantial resources on abiding by the term sheet following the Petition Date and should not be denied the benefits of their bargain after Legalist satisfied all of its obligations by committing to lend and waiving the due diligence-out.

G.     **Prompt Payment of Legalist's Administrative Claim is Appropriate to Avoid Hardship to Legalist.**

21.     In considering when to authorize payment of administrative claims, courts may properly consider the "hardship to the claimant." *In re ATP Oil & Gas Corp.*, No. 12-36187, 2014 WL 1047818, at *10 (Bankr. S.D. Tex. Mar. 18, 2014) (citing *In re UTEX Commc'ns Corp.*, 457 B.R. 549, 569 (Bankr. W.D. Tex. 2001)). Legalist answers to its investors who have the ability to withdraw their funds. The approximately $185,000 accrued by Legalist in professional fees just be covered by the Break-Up Fee. If the Debtors elected to effectuate Legalist's DIP Credit Agreement, the Debtors would be on the hook for approximately $1,230,000 of increased fees. As such, the Debtors only have to pay $250,000 for the benefit of essentially having a stalking horse DIP lender.

## VI.  <u>NOTICE</u>

21.     Notice of this Motion will be served on any party entitled to notice under Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

Dated: August 11, 2023                    Respectfully submitted

                                          **FOLEY & LARDNER LLP**

                                          By:   /s/*John P. Melko*
                                                John P. Melko
                                                Foley & Lardner LLP
                                                1000 Louisiana, Suite 2000
                                                Houston, Texas 77002
                                                Telephone: (713) 276-5500
                                                Facsimile: (713) 276-5555

                                                and

                                                Jake William Gordon (*admitted pro hac vice*)
                                                Foley & Lardner LLP
                                                500 Woodward Avenue, Suite 2700
                                                Detroit, Michigan 48226
                                                Telephone: (313) 234-7100

                                          **ATTORNEYS FOR LEGALIST, INC.**

## **CERTIFICATE OF ACCURACY PURSUANT TO B.L.R 9013-1(i)**

In accordance with Bankruptcy Local Rule 9013-1(i), I hereby certify the accuracy of the matters set forth in the foregoing Motion.

By: */s/John P. Melko*
John P. Melko

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Motion was served on this, 11th day of August, 2023 on all parties entitled to receive service through the Court's CM/ECF system.

*/s/ John P. Melko*
John P. Melko

15