IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-90558 |
| **PARADOX RESOURCES, LLC,** *et al.,* | § | |
| | § | Chapter 11 |
| Debtors.[1] | § | |
| | § | (Jointly Administered) |

**DEBTORS' OBJECTION TO LEGALIST, INC.'S MOTION
FOR ENTRY OF AN ORDER (I) ALLOWING AND DIRECTING
PAYMENT OF ITS ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO
11 U.S.C. §§ 503(b)(1)(A) AND 503(b)(3)(D) AND (II) GRANTING RELATED RELIEF**
(Relates to ECF # 220)

Paradox Resources, LLC, *et al.*, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby file this *Objection* (the "Objection") *to Legalist, Inc.'s Motion for Entry of an Order (I) Allowing and Directing Payment of Its Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(b)(1)(A) and 503(b)(3)(D) and (II) Granting Related Relief* [ECF # 220] (the "Motion"), and in support hereof, respectfully state as follows:

## I. PRELIMINARY STATEMENT

1. A Hearing on the Debtors' DIP Motion was scheduled for June 26, 2023. "Despite substantial efforts, Legalist was not ready to move forward with the hearing on June 26." *See* Motion, ¶ 11. The delays in Legalist's internal approval process created a window of opportunity for another lender to step in. After realizing that the Debtors accepted an alternative financing proposal, Legalist endeavored to retroactively satisfy conditions precedent to funding in an effort to transform a non-binding Term Sheet into an affirmative commitment to lend.

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Paradox Resources, LLC (7152); Paradox Midstream, LLC (2127); Paradox Upstream, LLC (0256); Capital Commercial Development, Inc. (3124); Neuhaus Barrett Investments, LLC (5529); Four Corners Energy, LLC (8159); and Four Corners Pipeline, LLC (8748). The Debtors' service address is: 500 Dallas Street, Suite 1600, Houston, Texas 77002.

2. As explained in this Objection, Legalist's Motion should be denied because the conditions precedent to funding were never satisfied, the Term Sheet was and remains non-binding, and Legalist's efforts to retroactively create a binding commitment fail on their face. Even if the Term Sheet were binding, Legalist failed to timely provide written notice that it had completed due diligence and had committed to lend. Accordingly, Legalist is not entitled to allowance or payment of a contractual Break-Up Fee, a substantial contribution claim, or any other form of administrative expense claim under any legal theory, and the Court should deny the Motion.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. BACKGROUND

### A. In General

4. On May 22, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court"). The Debtors' chapter 11 cases (the "Chapter 11 Cases") have been consolidated for procedural purposes only and are being jointly administered by the Court under Case No. 23-90558.

5. Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are operating their businesses and managing their property as debtors in possession. On June 20, 2023, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the Chapter 11 Cases.

**B.      The Legalist Term Sheet**

6.      Prior to the Petition Date, on May 3, 2023, the Debtors executed that certain *Summary of Key Terms and Conditions for Debtor-in-Possession Term Loan Facility* (the "Term Sheet") with Legalist, Inc. ("Legalist").  A copy of the Term Sheet is attached hereto as **Exhibit A** and incorporated by reference herein.  Although the Term Sheet summarizes the key terms on which Legalist would have acted as a DIP Lender in these Chapter 11 Cases, the Term Sheet provides that "[p]rior to satisfaction of the Conditions Precedent to funding, this Term Sheet shall be ***confidential, non-binding, for discussion purposes only, and not a commitment to lend.***" *See* Term Sheet, p.1 (emphasis in original).  The Conditions Precedent to the effectiveness of this non-binding Term Sheet are:

| Conditions Precedent to DIP Draw | The DIP Lender will make available DIP Loans in multiple draws, provided no event of default shall (x) have occurred and be continuing or (y) be reasonably likely to result therefrom, upon (such date the "**Effective Date**"):<br>1. The DIP Lender's completion, to its own satisfaction, of any remaining due diligence;<br>2. The Debtor's delivery of a fully executed credit agreement in Approved Form;[1] and<br>3. The Bankruptcy Court's entry of an interim and final financing order approving the DIP Loans and otherwise in Approved Form (the "**DIP Order**"), which remains in full force and effect. |
|---|---|

7.      Although the Term Sheet is non-binding on its face and is expressly subject to the requirement that the enumerated Conditions Precedent to funding be satisfied, it further provides for a $250,000 Break-Up Fee as follows:

| Break-Up Fee | In the event that, after execution hereof and after the DIP Lender provides written notice that it has completed its due diligence and is prepared to commit to lend, the transaction described herein should not be timely effected for any reason other than the breach by DIP Lender or the DIP Lender's decision not to proceed, the DIP Lender shall (and without any further action or notice) be entitled to a fee of $250,000 (the "**Break-Up Fee**").[3] |
|---|---|

8.      With respect to the Break-Up Fee, the Term Sheet makes a specific reference to section 503(b)(1)(A) of the Bankruptcy Code by providing that "[t]he Debtor acknowledges that

3

the Break-Up Fee is intended to be an actual, necessary cost and/or expense of preserving its estate and, thus, entitled to priority under Bankruptcy Code section 503(b)." *See* Term Sheet, fn. 3. While specific reference is made to preservation of the bankruptcy estate under Bankruptcy Code section 503(b)(1)(A), there is no provision for actual, necessary expenses of a creditor in making a substantial contribution pursuant to section 503(b)(3)(D).

**C.    The Legalist DIP Negotiations**

9.    After the Petition Date, the Debtors and Legalist continued to negotiate a post-petition debtor-in-possession loan (a "DIP Loan"). Due to significant delays in getting approval from the Legalist investment committee, the Debtors twice obtained Court-approved protective advances from their prepetition lender, Washington Federal Bank ("WaFd") to sustain their operations and preserve estate assets.

10.    On June 20, 2023, Legalist delivered email correspondence to the Debtors stating that "[w]e have investment committee approval to proceed with the DIP. Let's get everything negotiated and finalized ASAP." **Exhibit B**. At that time, the actual DIP Loan documents were still the subject of ongoing negotiations, and none were in "Approved Form" in accordance with the Term Sheet. *See* Term Sheet, fn. 1 ("Approved Form" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.").

11.    On June 22, 2023, the Debtors filed their *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral; (II) Authorizing the Debtors to Obtain Secured Post-Petition Financing; (III) Granting Liens and Superpriority Claims; (IV) Granting Adequate Protection; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [ECF # 92] (the "DIP Motion"). Attached as exhibits to the DIP Motion were then-current drafts of the proposed interim order (the "Interim Order"), the *Senior Secured Debtor-in-Possession Credit*

*Agreement* (the "Credit Agreement"), and the DIP Loan budget (the "Budget," and collectively with the Interim Order and the Credit Agreement, the "DIP Documents"). As Legalist notes in its Motion, the DIP Motion, Interim Order, and Credit Agreement were filed in a form agreed upon by the Debtors and Legalist, but no other party in interest had reviewed the documents or provided any comments. Regardless, as of the filing of the DIP Motion, the Conditions Precedent in the Term Sheet remained unsatisfied because Legalist had not provided notice of the completion of due diligence or commitment to lend, the Credit Agreement was not executed or in a final Approved Form, and the Court had not yet entered any DIP Order (as defined in the Term Sheet) in a final Approved Form.

12. The Court set a hearing (the "Hearing") on the DIP Motion for June 26, 2023 at 5:00 p.m. (prevailing Central Time). *See* ECF # 95 (Courtroom Minutes) and ECF # 99 (Notice of Hearing).

13. After filing the DIP Motion, the Debtors and Legalist began receiving formal and informal comments from parties in interest on the DIP Documents. Specifically, the Committee provided its comments on the Interim Order on June 25, 2023 and further noted its questions and concerns regarding the proposed Budget and the Credit Agreement. *See* **Exhibit C**. That same day, WaFd filed its objection [ECF # 109] to the DIP Motion. Other creditors also filed limited objections and requested revisions to certain of the DIP Documents. Thus, although Legalist's Motion attempts to fault the Debtors' June 23rd revisions to the Budget as the **sole issue** causing their failure to move forward with lending, there is no doubt that the DIP Documents were not even in final Approved Form at that time.

14. On June 26, 2023, the date of the Hearing as initially scheduled, the Debtors continued to work with Legalist to resolve their open issues and to incorporate changes to the DIP

5

Documents based on comments received from various parties in interest, including further revisions from Legalist. As of 4:13 p.m. (prevailing Central Time), counsel for Legalist was "[s]till waiting to hear back on other items" in the DIP Documents which were the subject to ongoing review and revision. *See* **Exhibit D**.

15. At 4:33 p.m. (prevailing Central Time) on June 26, B. Riley Financial, Legalist's financial advisor, requested that the Debtors immediately provide more granular information on the Budget changes, and counsel for Legalist promptly copied in the Debtors' counsel because the Hearing was just minutes away from starting. *See* **Exhibit E**.

16. Although the DIP Documents still were not in a final Approved Form, at 4:41 p.m., counsel for the Debtors filed a revised proposed Interim Order [ECF # 119] with a then-current Budget attached thereto in the hopes that Legalist would nevertheless commit to lend at the Hearing. That did not happen, and as Legalist notes in its Motion, "Legalist was not ready to move forward with the hearing on June 26." *See* Motion, ¶ 11.

17. According to the Motion, however, "Legalist was committed to lend" on the night of June 26 when, after the initial Hearing, they participated in a multi-hour phone call with the Debtors to get comfortable with the revised Budget submitted by the Debtors. *See* Motion, ¶ 11.

18. The June 26 Hearing was first continued to June 27 at 12:00 p.m., but due to a scheduling conflict involving the Debtors' witnesses who would be needed to provide critical testimony at a contested Hearing, the Debtors requested that it be pushed back until 5:00 p.m. All parties agreed to reschedule the Hearing, and the Debtors provided notice of the same. *See* ECF # 123 (Notice of Reset Hearing).

19. Legalist asserts in the Motion that, unbeknownst to them, the rescheduling of the Hearing was merely a ploy by the Debtors to gain additional time to negotiate a DIP Loan with

WaFd. *See* Motion, ¶ 12. Further, Legalist reiterates that it was already committed to moving forward, stating that "Legalist was prepared to proceed at noon [on June 27], but the Debtors were not." *Id*.

20. Notwithstanding the factual allegations in the Motion, Legalist was certainly not committed. On June 27 at 12:11 p.m. (prevailing Central Time), counsel for the Debtors asked counsel for Legalist to confirm that Legalist is proceeding with the continued Hearing at 5:00 p.m. in accordance with the same Budget previously provided by the Debtors (*i.e.*, the Budget submitted with the revised Interim Order shortly before the scheduled Hearing on June 26). *See* **Exhibit F**. Counsel further stated that if Legalist would not be able to proceed at that time, then the parties should avoid wasting time and resources. *Id*. Just two minutes later, counsel for Legalist responded and informed the Debtors that "[t]here is a 2 pm [eastern] call to discuss some of the numbers, and **our client has assured us they will have a thumbs up or down shortly thereafter**. As soon as we have an update, we'll share it." *Id*. (emphasis added).

21. While the Debtors waited for a response from Legalist, correspondence between advisors for the Debtors, Legalist, and the Committee continued with respect to open issues in the DIP Documents, including the Committee's requested changes to the Budget and objections to the Interim Order, and any other objections that needed to be addressed prior to the Hearing at 5:00 p.m. *See* **Exhibit G**.

22. After realizing that the Debtors were accepting an alternative proposal from WaFd while at the courthouse in the minutes before the 5:00 p.m. Hearing was to commence, and realizing further that Legalist had still not provided an affirmative "thumbs up or down" with respect to a commitment to lend, counsel for Legalist made a last-ditch attempt to trigger the Break-Up Fee provision by sending an email to Debtors' counsel at 4:56 p.m. stating "[f]or the

avoidance of doubt, this shall serve as written notice that as of the time of this email, the DIP Lender has completed its due diligence and is committed to lend." See **Exhibit H**. Thus, notwithstanding its assertions in the Motion that it was committed to lend on the night of June 26, or by noon on June 27, it wasn't until Legalist had actual knowledge that the Debtors had agreed to an alternative DIP Loan that Legalist made **any attempt** to provide written notice as required by the Term Sheet. The generic email notice from Legalist provides no indication as to whether Legalist was committed to lend on the same terms of DIP Documents and Budget it had previously balked at.

23. After the 5:00 p.m. Hearing concluded and the Court had already approved the alternative DIP Loan with WaFd, Legalist transmitted a letter at 6:04 p.m. (prevailing Central Time) proclaiming its "formal commitment to loan" to the Debtors. See **Exhibit I**.

## IV. OBJECTION

### A. The Term Sheet Is Non-Binding

24. The basis of Legalist's assertion that it is entitled to an administrative expense claim against the Debtors in the Chapter 11 Cases is a prepetition Term Sheet which, on its face, is expressly non-binding, for discussion purposes only, and not a commitment to lend. The Term Sheet is made contingent upon the Conditions Precedent to funding being satisfied and, by implication, without such prior satisfaction of the Conditions Precedent the Term Sheet remains non-binding. *See, e.g., Energy Transfer Partners, L.P. v. Enter. Prods. Partners, L.P.*, 593 S.W.3d 732, 740 n.33 (Tex. 2020) ("A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement.") citing *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976).

25. Set forth below this disclaimer stating that the Term Sheet is non-binding prior to satisfaction of the Conditions Precedent to funding are the actual Conditions Precedent, only one of which Legalist argues it has satisfied.

| Condition No. | Condition Requirement | Date Satisfied |
|---|---|---|
| 1. | The DIP Lender's completion, to its own satisfaction, of any remaining due diligence. | June 27, 2023 (Disputed) |
| 2. | The Debtor's delivery of a fully executed credit agreement in Approved Form. | X |
| 3. | The Bankruptcy Court's entry of an interim and final financing order approving the DIP Loans any otherwise in Approved Form (the "DIP Order"), which remains in full force and effect. | X |

26. Because the Conditions Precedent were clearly never satisfied, the entirety of the Term Sheet remains nothing more than a non-binding piece of paper to be used for discussions between the parties as a summary of key terms upon which Legalist may have been willing to extend post-petition financing. A non-binding contract is no contract at all. *See, e.g., Medecor Pharma LLC v. Fleming Pharm., Inc.*, No. 12-291-JJB-RLB, 2014 U.S. Dist. LEXIS 864, at *10 (M.D. La. Jan. 6, 2014) (finding that alleged breach of a "non-binding" term sheet was insufficient to sustain a breach of contract claim).

27. The non-binding nature of the entire Term Sheet extends to the Break-Up Fee provision which forms the basis of the Legalist Motion. Had the parties intended for that specific provision to be binding notwithstanding every other provision, the Term Sheet could have stated as much. The Debtors' acknowledgement that the Break-Up Fee is intended to be an actual, necessary cost of preserving the estate and entitled to priority under section 503(b) of the Bankruptcy Code is qualified entirely on that provision first becoming a binding obligation, which it was not. Accordingly, the Court should deny Legalist's Motion because there is no basis for asserting that a

9

4877-3473-3692, v. 6

non-binding provision in a non-binding Term Sheet entitles Legalist to an administrative expense claim in the Chapter 11 Cases.

### B. Legalist Was Not Committed to Lend

28. Even assuming, *arguendo*, that the Break-Up Fee provision can be severed and determined to be a binding provision in this otherwise non-binding Term Sheet, that specific provision required Legalist to provide written notice to the Debtors that it has completed its due diligence and is committed to lend.

29. The first such notice arguably came via email from Legalist's counsel at 4:56 p.m. (prevailing Central Time) on June 27, just minutes before the 5:00 p.m. Hearing, and only *after* the Debtors informed Legalist that they would not consummate any transaction with Legalist. At the time the generic email notice was received from Legalist's counsel, the Debtors still had no idea if Legalist would commit to loan pursuant to the DIP Documents and Budget it had already balked at one day earlier at the initial Hearing on June 26 (Legalist readily admits in the Motion that it was not prepared to move forward at that Hearing). *See* Motion, ¶ 11. Indeed, despite an express inquiry from the Debtors early in the afternoon on June 27 – the date of the continued Hearing – Legalist still could not give the Debtors a "thumbs up" or a "thumbs down."

30. Nevertheless, Legalist's Motion proclaims to the Court and all parties in these Chapter 11 Cases that it was absolutely committed to lend on the evening of June 26, then again on the morning of June 27, and that it would have proceeded with the Hearing at noon but for the Debtors manufacturing an excuse to push the Hearing further in the afternoon. Where is the written confirmation of its commitment to lend? Such a written document, in the form of a "formal notice" signed by Legalist's CEO, did not arrive until after an alternative DIP Loan with WaFd had already been approved by the Court. The Court should decline Legalist's requests for allowance and

10

payment of an administrative expense claim because Legalist never actually committed to provide any post-petition benefit to the Debtors' estates.

C.  **Legalist Does Not Meet the Standard of 11 U.S.C. § 503(b)(1)(A)**

31.  Legalist relies on the footnote in the Term Sheet to argue that the Break-Up Fee should be afforded administrative expenses status as an actual and necessary benefit to the Debtors' estates, and that "the Debtors recognized the value the Legalist DIP Term Sheet offered [the] estate regardless of whether the facility was effectuated." Motion, ¶ 15. However, the footnote merely explains what the Break-Up Fee was intended to be in the event that the "the transaction described [in the Term Sheet was not] timely effected for any reason other than the breach by the DIP Lender or the **DIP Lender's decision not to proceed**…" *See* Term Sheet, p. 2 (defining Break-Up Fee) (emphasis added). In any event, Legalist fails to meet the strict standards of section 503(b)(1)(A) and cannot demonstrate that it is entitled to a claim for "actual and necessary" expenses of preserving the estates.

32.  Section 503 of the Bankruptcy Code pertains to entities that have incurred administrative expenses and wish to request payment from the estate, and such claims generally stem from voluntary transactions between a debtor and third party who lends goods or services necessary to the successful reorganization of the debtor's estate. *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (citing *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001)). As the claimant seeking administrative expenses, Legalist has the burden of proving that the Term Sheet providing for the Break-Up Fee arose (1) "post-petition and as a result of actions taken by" the Debtors. *Off. Comm. of Unsecured Creditors v. Bouchard Transp. Co. (In re Bouchard Transp. Co.)*, 2023 U.S. App. LEXIS 19000 *12 (5th Cir. Jul. 25, 2023). Legalist must also prove that the

11

Break-Up Fee constitutes (2) "actual" and (3) "necessary costs and expenses of preserving the estate." *Id*. (quoting 11 U.S.C. § 503(b)(1)(A). Legalist cannot satisfy any of these requirements.

        i.        <u>*The Term Sheet is not a post-petition agreement.*</u>

33.     Legalist does not meet the first essential requirement of an administrative claim under section 503(b) of the Bankruptcy Code because, as a threshold matter, it is undisputed that the Term Sheet was a non-binding, prepetition agreement. As the Fifth Circuit recently explained in *Bouchard*,

> "[t]he focus of the requirement is not so much on the *agreement*, but on its *postpetition* nature. The reason that a § 503(b) administrative expense must arise from a postpetition agreement is that claims for administrative expenses get priority over most other unsecured claims. That priority encourages third parties to service the debtors' estate that would otherwise not do so out of fear that they might not get paid. But that incentive 'is not required…when the relevant obligation pre-dates the bankruptcy.'"

*Bouchard*, 2023 U.S. App. LEXIS 19000 *13 (quoting *Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II)*, 931 F.3d 432, 441-42 (5th Cir. 2019)).

34.     Here, the relevant obligation (to the extent it is even considered a binding obligation) pre-dates the filing of the Debtors' Chapter 11 Cases and Legalist cannot meet this initial hurdle of demonstrating a post-petition agreement. Moreover, Legalist's Motion flies in the face of the policies underlying section 503(b) claims. Legalist seeks allowance and payment of a post-petition administrative expense claim to the detriment of all other unsecured creditors without ever agreeing to provide the DIP Loan to the Debtors to support the reorganization process. *ASARCO, L.L.C.*, 650 F.3d at 601. In the absence of an actual "transaction with the debtor in possession" during the Chapter 11 Cases, Legalist never did the one thing that this section of the Bankruptcy Code was designed to remedy – extending credit to the Debtors so that they could continue to conduct business

and thus generating funds from which prepetition creditors can be paid. *Whistler Energy II*, 931 F.3d at 441-42. On that basis alone, the Court should deny the Motion.

ii. *The Term Sheet and Break-Up Fee were not actual or necessary benefits.*

35. Under section 503(b)(1)(A) of the Bankruptcy Code, an administrative claim may be allowed if it was an actual, necessary cost or expense of preserving the estate. 11 U.S.C. § 503(b)(1)(A). The Court must "scrutinize claimed expenses for waste and duplication to ensure that expenses were indeed actual and necessary." *Matter of DP Partners Ltd. Partnership*, 106 F.3d 667, 673 (5th Cir. 1997). Bankruptcy courts enjoy broad discretion in making these determinations. *Id*. at 673-74.

36. As explained above, Legalist never committed to lending to the Debtors, and no actual benefits were provided to the estates as a result of the Term Sheet. Legalist's assertion that it provided an actual benefit to the Debtors while simultaneously balking at providing the DIP Loan can be appropriately described as a paradox in the context of these Chapter 11 Cases.

37. Moreover, when "testing whether a particular expense was truly 'necessary' to the estate," the Fifth Circuit has explained that "[i]f it was of no 'benefit,' it cannot have been 'necessary' within the meaning of § 503(b)(1)(A)." *Whistler Energy II*, 931 F.3d at 443 (citing *In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 437 (5th Cir. 1998) and *In re TransAmerican Nat. Gas. Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)(the words 'actual' and 'necessary' have been construed narrowly: the debt must benefit the estate and its creditors.)).

38. The Term Sheet and Break-Up Fee provision provided no benefit to the Debtors' estates and their creditors in these Chapter 11 Cases, and by failing to affirmatively give the Debtors a "thumbs up or down" and commit to providing the Debtors with the DIP Loan, Legalist cannot demonstrate that the Debtors somehow induced Legalist's availability as a lender for the benefit of

13

the estate. *Whistler Energy II*, 931 F.3d at 444 (the ordinary cost of ensuring availability qualifies as an administrative expense when the debtor induces the availability and the estate derives a benefit from it).

39. "Conducting business as usual often requires that certain goods or services be available, even if ultimately not used." *Id*. As Legalist notes in its Motion, "the Debtors were in dire need of cash and scrambling to identify a source to provide it." *See* Motion, ¶ 8. Legalist does not dispute that it was not prepared to move forward with the Hearing on June 26 and, as of the afternoon on June 27, the Debtors still had no idea if Legalist would commit to lend at the time of the rescheduled Hearing. Legalist's Motion does not present a situation in which the Debtors induced Legalist to provide a DIP Loan, such DIP Loan was made available and thereby benefited the estate, and the Debtors ultimately declined to use it. The very definition of the word "available" is something that is present or ready for immediate use.[2] That is not the case here. Legalist did not provide any benefit to the estate, was not induced to provide a benefit to the estate, and yet invites the Court to grant it an allowed administrative expense claim of $250,000. The Court should decline to do so and should enter an order denying the Motion.

**D.    Legalist is Not Entitled to a Substantial Contribution Claim**

40. Legalist requests in the alternative that the Court grant it an administrative claim pursuant to section 503(b)(3)(D) for making a substantial contribution to the Debtors in these Chapter 11 Cases. Section 503(b)(3)(D) of the Bankruptcy Code provides that compensable administrative expenses include the actual, necessary expenses … incurred by … a creditor in making a substantial contribution in a case…" 11 U.S.C. § 503(b)(3)(D). Legalist cannot carry the burden of proof on this issue, and the Court should deny such request.

---

[2] "Available." *Merriam-Webster.com Dictionary*, https://www.meriam-webster.com/dictionary/available (last accessed Sep. 1, 2023).

41. To the extent the Term Sheet provides any avenue for claiming an administrative expense under Bankruptcy Code section 503, it is expressly limited to actual, necessary costs of preserving the estate under section 503(b)(1)(A). No mention is made of section 503(b)(3)(D), and the Court should not read one into the Term Sheet in the absence of an express provision.

42. Even if section 503(b)(1)(D) of the Bankruptcy Code were applicable here, Legalist's actions do not rise to the level of providing a substantial contribution. Legalist argues that it acted as a stalking horse DIP Lender in these Chapter 11 Cases, but never fully and completely committed to lending. A stalking horse is one that sets a bidding floor and induces competitive bidding that may produce higher or better offers but, in circumstances where no better offers are received, results in a transaction that can still be consummated because a firm offer is already in hand. Legalist cannot rely on the fact that WaFd made an alternative proposal to the Debtors to manufacture an argument that it was a stalking horse entitled to the Break-Up Fee. Legalist was not a stalking horse; it was a failed potential lender that the Debtors were forced to replace at the last moment. Legalist should not be rewarded for having cost the Debtors' estate time and money negotiating a DIP Loan for nearly two (2) months only to have them balk at lending at the initial Hearing.

E. **The Executory Contract Theory Does Not Hold Water**

43. Legalist further asserts in the alternative that if it did not provide a substantial contribution, it was still acting on a post-petition basis pursuant to a prepetition executory contract that has not been rejected by the Debtors. This argument is without merit.

44. Legalist readily admits that the lending commitment itself is not executory pursuant to section 365(c)(2) of the Bankruptcy Code. It asserts, however, that its commitment to be available as a potential DIP Lender to the Debtors, as well as the Debtors' obligation to pay the Break-Up

15

Fee, are each executory. Moreover, because the Debtors have had "ample opportunity" to reject the Term Sheet but have not done so thus far, Legalist asserts that the Debtors are therefore treating the Term Sheet as an active and ongoing contract.

45. First, there has been no admission by the Debtors that the Term Sheet or any portion thereof is executory or that the Debtors have continuing obligations thereunder. Moreover, Legalist has not, contrary to its Motion, "satisfied all of its obligations by committing to lend and waiving the due diligence-out." *See* Motion, ¶ 20. As set forth above, Legalist never actually provided proper written notice of its commitment to lend, and certainly did not waive its due diligence-out. Quite the opposite, Legalist relied on its due diligence-out as a continued means of refusing to commit to lend when the time came to do so. Legalist was stuck in a perpetual cycle of due diligence that prevented it from pulling the trigger on a commitment to fund a DIP Loan in these Chapter 11 Cases. The Debtors expended substantial time and resources trying to get Legalist "over the hump," including asking point blank if they intended to move forward with the 5:00 p.m. hearing on June 27 so that the parties would not waste further time and resources. As explained herein, Legalist still would not affirmatively commit to lending.

46. In any event, Legalist cannot rely on the alleged executory nature of the Term Sheet as a means of claiming an administrative expense. "[A] pre-petition contract does not implicate the concerns underlying section 503(b)(1)(A)." *Whistler Energy II*, 931 F.3d at 432. Accordingly, Legalist is not entitled to an administrative expense claim in these Chapter 11 Cases, and the Motion should be denied.

F. **Legalist Will Not Suffer Hardship Without Prompt Payment**

47. Pursuant to the proposed order submitted with the Motion, Legalist requests that the Court order payment of $250,000 to Legalist within seven (7) days of entry of the order. While

explaining that courts may properly consider hardship to the claimant when considering when to authorize payment of administrative claims, Legalist does not actually assert that it will suffer any hardship whatsoever. The Motion merely states that Legalist "answers to its investors who have the ability to withdraw their funds." *See* Motion, ¶ 21. No allegation is made that investors are threatening to do so, or that Legalist would suffer any other harm if payment is not immediately made. The Debtors respectfully submit that, to the extent the Court is inclined to allow any administrative claim by Legalist in the Chapter 11 Cases, such payment should not be made except pursuant to a chapter 11 plan. The Debtors are not flush with cash, and entry of an order requiring immediate payment of this sizeable Break-Up Fee would cause more harm to the Debtors than Legalist would suffer if required to wait for payment like all other administrative claimants.

## V.  **PRAYER**

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form submitted herewith, (i) denying Legalist's Motion; and (ii) granting the Debtors such other and further relief as this Court may deem just and proper.

Respectfully submitted on the 1st day of September, 2023.

**OKIN ADAMS BARTLETT CURRY LLP**

By:     /s/ *Matthew S. Okin*
      Matthew S. Okin
      Texas Bar No. 00784695
      Email: mokin@okinadams.com
      David L. Curry, Jr.
      Texas Bar No. 24065107
      Email: dcurry@okinadams.com
      Ryan A. O'Connor
      Texas Bar No. 24098190
      Email: roconnor@okinadams.com
      1113 Vine St., Suite 240
      Houston, Texas 77002
      Tel: 713.228.4100
      Fax: 346.247.7158

**ATTORNEYS FOR THE DEBTORS**

**CERTIFICATE OF SERVICE**

    I hereby certify that on September 1, 2023 a true and correct copy of the foregoing Objection was served via this Court's CM/ECF notification system to those parties registered for service upon filing of the same.

By:   /s/ *Matthew S. Okin*
      Matthew S. Okin

18